UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CARLOS COLLAZOS,

                     Plaintiff,

          - against -

GARDA CL ATLANTIC, INC.,

                   Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-2095 (PKC) (JRC)

PAMELA K. CHEN, United States District Judge:

       In this action, Plaintiff Carlos Collazos, on behalf of a putative class, alleges that Defendant

Garda CL Atlantic, Inc. ("Garda") violated New York employment laws. Garda now moves to

compel arbitration under the Federal Arbitration Act ("FAA"), the Labor Management Relations

Act ("LMRA"), and New York law. For the reasons stated herein, despite Garda being precluded

from relying on the LMRA to compel arbitration, the Court grants its motion pursuant to the FAA

and stays this matter in the interim.

## BACKGROUND

       Defendant Garda is a Delaware entity operating a fleet of armored vehicles that delivers

and handles currency. (Dkt. 1-1, ¶¶ 2–3; *see also* Dkt. 35-1, at 3, Article 2, (d) (stating that Garda

"has been involved in armored car operations in the United States since 1941.").)[1] From 2010

until about August 2018, Garda employed Plaintiff Collazos, a New York citizen, in a Long Island

warehouse as a driver and messenger assisting with the delivery and pickup of boxes of coins and

---

[1] For purposes of this motion, the Court accepts as true the non-conclusory allegations in
the Complaint. *See Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020) ("The court, in
deciding a Rule 12(b)(6) motion to dismiss a complaint, is required to accept all well-pleaded
factual allegations in the complaint [as true]." (citation and quotations omitted)); *Sabir v. Williams*,
52 F.4th 51, 54 (2d Cir. 2022) (same). The Court further notes that, through several wholly-owned
entities, an entity named Garda World Security Corporation owns Garda. (Dkt. 3, ¶¶ 1–4.)

other currency.  (Dkt. 1-1, ¶¶ 14, 16, 20–21.)  Between March 2015 until August 2018, Plaintiff

earned between $18.60 to $20.95 per hour.  (Dkt. 8-1, ¶¶ 3–8.)  During the period of Plaintiff's

employment with Garda, the company had an "overtime-over-50" policy, under which Garda paid

its drivers elevated overtime payments only when drivers worked in excess of 50 hours in a week.

(Dkt. 1-1, ¶ 15.)  Garda paid its drivers on a bi-weekly basis.  (*Id.* ¶¶ 24–25.)

Two different labor unions—the United Federation of Special Police and Security Officers,

Inc. ("UFSPSO") and the Special and Superior Officers Benevolent Association ("SSOBA")—

represented the drivers at Garda during the time that Collazos worked there.  (*See* Dkt. 35, ¶¶ 2–

3.)  On April 7, 2017, the UFSPSO entered into a collective bargaining agreement with Garda (the

"2017 CBA").  (Dkt. 35-1.)  The 2017 CBA governed the relationships of part-time and full-time

employees who worked as "street, shuttle, and vault driver/messengers/guards" of Garda.  (*Id.* at

2, Article 1.)  The 2017 CBA governed issues of discipline, holidays, paid time-off, and insurance,

among others.  (*Id.* at 4–18.)  UFSPSO and Garda executed the agreement in Long Island, New

York, and the term of the agreement ran from June 1, 2016, until May 31, 2019.  (*Id.* at 30, Article

28.)  Of relevance, the 2017 CBA provided an arbitration mechanism:

**ARTICLE 4 – GRIEVANCE AND ARBITRATION:**

(a) A grievance is defined as a condition that exists as a result of an unsatisfactory
response or adjustment or failure to adjust a legitimate controversy, claim or dispute
by an employee, shop steward or the [UFSPSO] concerning rates of pay,
entitlement to compensation, benefits, hours, or working conditions set forth herein,
including without limitation, claims of harassment or discrimination or hostile work
environment in any form, including without limitation, any claim based on race,
sex, religion, national origin, ethnicity, gender, disability or perceived disability, or
age, veteran or military status, or any claim of retaliation for making any such or
similar claim, or the interpretation or application of this Agreement or any
agreement made supplementary thereto, or any claim under any federal, state or
local law, statute or regulation or under any common law theory whether residing
in contract, tort or equity or any other claim related to or part of the employment
relationship.

2

(b) Any grievance shall be presented in writing to the [Garda] by the [UFSPSO] representative within fourteen (14) calendar days from the occurrence or knowledge of the occurrence giving rise to this grievance.

(c) Upon submission of a grievance [Garda] shall have fourteen (14) calendar days to respond. If any response is deemed inadequate by the [UFSPSO], then the [UFSPSO] shall have fourteen (14) calendar days to request mediation or arbitration. Prior to actual submission to arbitration a management-union meeting shall be scheduled to attempt resolution of any dispute for which arbitration has been requested. Any agreement to submit the grievance to mediation with the Federal Mediation and Arbitration Service shall stay any arbitration until the mediation is held and is unsuccessful or the parties agree to forego mediation. If after such management union meeting or mediation, arbitration is still necessary because a legitimate as well as significant issue of contract application remains open, then both [Garda] and the [UFSPSO] shall prepare a written position statement for submission to the arbitrator. . . .

(Dkt. 35-1, at 8–9.) Seven months after it signed the 2017 CBA, the UFSPSO stopped representing the Garda drivers. (Dkt. 18-1, at 2.) On October 12, 2017, the SSOBA started representing them instead. (*Id.*) Plaintiff left his employment with Garda in August 2018. (*See* Dkt. 1-1, ¶ 18; *see also* Dkt. 8-1, ¶ 8.)

After Plaintiff's departure, on September 1, 2018, the SSOBA signed a new collective bargaining agreement ("2018 CBA") with Garda. (Dkt. 35-2.) The 2018 CBA, which resembled its predecessor agreement in most respects, remained in force until August 31, 2021. (Dkt. 35-2, at 25; Dkt. 23-1, at 1.)[2] Unlike the 2017 CBA, however, the 2018 CBA contains the following provision, requiring individuals to arbitrate individually and not as a class:

(g) The [SSOBA] and [Garda] agree to file and/or bring any grievance alleging any statutory wage violation or discrimination claim on an individual basis only and not on a class or collective basis on behalf of more than one (1) bargaining unit employee, and any arbitrator selected to hear or resolve a grievance shall not have the power or authority or jurisdiction to permit a class or collective basis arbitration proceeding or render a decision on behalf of more than one (1) bargaining unit employee, unless [SSOBA], the concerned bargaining unit employees and the

---

[2] Another collective bargaining agreement, which is not at issue in this case and is currently in force, succeeded the 2018 CBA after it expired at the end of August 2021. (Dkt. 35-2, at 25; Dkt. 23-1, at 1.)

3

[Garda] otherwise consent in writing before the arbitration proceeding is commenced.

(Dkt. 35-2, at 9.)

## II. Procedural History

On March 11, 2020, Plaintiff filed this action in the Queens County Supreme Court, and Defendant timely removed it to this district on April 16, 2021. (Dkt. 1, ¶ 1.) Plaintiff sues on behalf of a class of about 200 drivers who worked for Garda during the six years preceding the filing of this lawsuit. (*Id.* ¶ 5; Dkt. 1-1, ¶¶ 26, 29.) The thrust of the Complaint is that Garda's policies regarding overtime pay and the bi-weekly pay schedule violate N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.2 ("Section 142-2.2"), and New York Labor Law § 191 (McKinney 2023) ("Section 191"). (Dkt. 1-1, ¶ 1.) More specifically, Plaintiff alleges that: (1) Garda's "overtime-over-50" policy violated New York law, in force throughout his employment, which required that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate [for working time over 40 hours per week]," *see* Section 142-2.2; and (2) Garda's bi-weekly pay policy violate another provision of New York law, in force at the time, requiring that "[e]very employer shall pay wages [to] manual worker[s] . . . weekly and not later than seven calendar days after the end of the week in which the wages are earned." *See* Section 191. (Dkt. 1-1, ¶¶ 35–45.)

On September 15, 2021, Garda filed a pre-motion conference ("PMC") request regarding its proposed motion to arbitrate. (Dkt. 12.) As relevant here, Garda only cited the FAA in support of its proposed motion to arbitrate. (*Id*. at 2-4 (discussing motion solely in the context of FAA.).) On October 1, 2021, Plaintiff filed a letter responding to Garda's PMC request opposing arbitration and asserting that neither the 2017 nor 2018 CBAs compel arbitration. (Dkt. 13 at 2.) On May 18, 2022, Defendant served its motion to compel on Plaintiff; that motion also relied solely on the

FAA and did not reference the LMRA. (Dkt. 28.[3])  A day before Plaintiff's opposition was due, Defendant asked for a brief extension, with Plaintiff's consent, ostensibly to allow Defendant to brief an intervening Supreme Court decision on the FAA. (Dkt. 30.)  On June 24, 2022, Defendant filed a "Second Revised" PMC request[4] in connection with its proposed motion to compel arbitration. (Dkt. 31.)  Defendant did not reference the LMRA (or FAA) in this letter. (*Id.*)

On July 13, 2022, Defendant filed its "revised" motion to compel arbitration, relying, for the first time, on the LMRA, along with the FAA. (Dkts. 36, 37.)  Plaintiff has opposed that motion.[5]  (Dkt. 40.)

## LEGAL STANDARDS[6]

---

[3] Though only the transmittal cover letter for that motion was filed on the docket, the Court infers from later filings that the motion that Defendant served on May 18, 2021 referenced only the FAA.

[4] Though Garda characterized this filing as a "Second Revised Motion to Compel Arbitration" (Dkt. 31), its letter was, in fact, an abbreviated PMC letter renewing its request to file a motion to compel arbitration.

[5] Both the UFSPSO and SSOBA filed letters disclaiming their obligations to arbitrate, in whole or in part. (*See* Dkts. 18-1, 23-1.)  The UFSPSO objects that it is no longer the certified labor union, and the relevant claims accrued after its decertification. (Dkt. 18-1.)  As discussed *infra*, because of Plaintiff's concession that the subsequent 2018 CBA binds him, the UFSPSO's objection has become irrelevant. The SSOBA objects that it must only arbitrate claims that accrued after its agreement came into effect. (Dkt. 23-1.)  Consistent with the Court's conclusion below, to the extent the SSOBA refuses to arbitrate this matter, the Court will entertain Plaintiff's motion to be excused from arbitration.

[6] Garda did not forfeit its LMRA and New York law arguments by omitting them from its pre-motion conference letters and its request for extension. *See Feldman v. Comp Trading, LLC*, No. 19-CV-4452 (RPK) (RLM), 2021 WL 930222, at *3 (E.D.N.Y. Mar. 11, 2021) ("[D]efendants [did not] waive their group-pleading argument by failing to raise it in their request for a pre-motion conference." (collecting cases)).  Nor does Garda's failure to comply with Local Rule 7.1(a)(1)— and identify these causes of action in its motion notice—require dismissal of its claims. *See Anhui Konka Green Lighting Co., LTD. v. Green Logic LED Elec. Supply, Inc*., No. 18-CV-12255 (MKV) (KHP), 2021 WL 621205, at *1 (S.D.N.Y. Feb. 17, 2021) ("Courts in the Second Circuit have been reluctant to dismiss motions for violating Local Rule 7.1(a)(1), reasoning that it would serve the interests of justice to resolve the motion on the merits rather than on procedural deficiencies." (cleaned up) (collecting cases)).  Nevertheless, Plaintiff is correct that documents

Federal law offers two modes of enforcing arbitration clauses contained in collective bargaining agreements: the FAA and the LMRA, which the Second Circuit has found to be mutually exclusive.  *See Coca-Cola Bottling Co. of New York v. Soft Drink & Brewery Workers Union Loc. 812 Int'l Bhd. of Teamsters*, 242 F.3d 52, 53 (2d Cir. 2001) ("[I]n cases brought under Section 301 of the Labor Management Relations Act of 1947[,] the FAA does not apply."); *A&A Maint. Enter., Inc. v. Ramnarain*, 982 F.3d 864, 869, n.2 (2d Cir. 2020) ("[A]rbitrations in the labor context are governed by the [LMRA] rather than the FAA."); *Dylan 140 LLC v. Figueroa as Tr. of Bldg. Serv. 32BJ Health Fund*, 982 F.3d 851, 858 (2d Cir. 2020) ("[W]e . . . take this opportunity to reiterate that the FAA does not directly apply to cases brought under Section 301[.]" (cleaned up)); *accord Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 599 (6th Cir. 2016) ("Generally, there are two flavors of arbitration cases: labor arbitrations pursuant to collective-bargaining agreements and commercial arbitrations pursuant to other agreements.  [The] former class of cases is governed by [the LMRA,] . . . whereas the FAA frames the review of the latter.").[7]

---

must be complete and truthful, and that the Court's Local and Individual Rules must be followed. To the extent Plaintiff chooses to file a Federal Rule Civil Procedure 11 claim, the Court shall retain jurisdiction over the case for 30 days following the issuance of this Memorandum and Order.

[7] Other circuits, unlike the Sixth and the Second, take different or intermediate approaches as to the interplay between the LMRA and FAA in the context of collective bargaining agreements. *See, e.g.*, *Smart v. Int'l Bhd. of Elec. Workers, Loc. 702*, 315 F.3d 721, 724–25 (7th Cir. 2002) ("The [FAA] has no particular reference to [CBAs] and so if there were a conflict between the two statutes we would resolve it in favor of [the LMRA].  . . . [w]here there is no conflict, however, and the FAA provides a procedure or remedy not found in section 301 but does not step on section 301's toes, then . . . we apply the Federal Arbitration Act."); *Int'l Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1097 (8th Cir. 2004) (holding that "section 301 takes precedence over the FAA where conflicts might exist[].");  *Int'l Bhd. of Elec. Workers, Loc. #111 v. Pub. Serv. Co. of Colorado*, 773 F.3d 1100, 1106 (10th Cir. 2014) ("We don't share [the] view that [the LMRA] and the FAA are mutually exclusive."); *PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 311–12 (3d Cir. 2021) ("[M]any labor arbitrations fall within the ambits of both the LMRA and the FAA.").  The distinction is usually of little importance in this Circuit, because "courts have often looked to the [Federal Arbitration] Act for guidance in labor arbitration cases."  *Dylan*, 982 F.3d at 859 (citation omitted).  The same applies in this case. It is true that, as Plaintiff argues, only the FAA contains an exemption from arbitration to

Thus, a preliminary question that the Court must resolve is whether the LMRA applies to this motion, to the exclusion of the FAA.  Because the statute of limitations has run on Defendant's LMRA claim, the Court holds that it does not.

## A.  The LMRA

### 1.  Legal Standard

"Section 301 of the LMRA governs actions by an employee against an employer for breach of a collective bargaining agreement."  *Dougherty v. Am. Tel. & Tel. Co.*, 902 F.2d 201, 203 (2d Cir. 1990).[8]  Courts have recognized two situations where state-law claims are converted to claims of contractual breach governed by the collective bargaining agreement, which requires "exhaust[ion] [of the] grievance procedures provided by [its] relevant [provisions]."  *Id.*  The first is when the LMRA preempts a plaintiff's state law claim and converts it to "a federal claim [that] arises under federal law."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Chu v. Chinese-Am. Plan. Council Home Attendant Program, Inc.*, 194 F. Supp. 3d 221, 226 (S.D.N.Y. 2016) (similar); *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 466 (S.D.N.Y. 2021) (similar).  The second is when the CBA itself applies to the dispute and "clearly and unmistakably" waives a plaintiff's ability to bring a statutory claim in a federal judicial forum.  *See Sanchez v. Clipper Realty, Inc.*, --- F. Supp. 3d ----, ----, No. 21 Civ. 8502 (KPF), 2022 WL 16578981, at *6 (S.D.N.Y. Oct.  31, 2022) (cleaned up); *Alderman v. 21 Club Inc.*, 733 F. Supp. 2d 461, 469

---

"transportation workers," *see* 9 U.S.C. § 1, while the LMRA does not.  But it is implicit in the Second Circuit's opinion in *Coca Cola*—which affirmed an order to compel arbitration, but held that the FAA was effectively displaced in LMRA actions—and explicit in the Supreme Court's view that the LMRA creates an obligation independent from the FAA to arbitrate.  *See Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448 (1957) (holding that § 301 provided authority to compel arbitration).  In short, even if Plaintiff is correct that he falls outside the FAA's scope, the LMRA provides as an independent basis to compel him to arbitrate.

[8] Thus, Plaintiff errs when suggesting that the LMRA may not be enforced against him because he is an employee and not a labor organization.

(S.D.N.Y. 2010) ("A collective bargaining agreement cannot preclude a lawsuit concerning individual statutory rights unless the arbitration clause in the agreement was 'clear and unmistakable.'"); *Lawrence v. Sol G. Atlas Realty Co.*, 841 F.3d 81, 84 (2d Cir. 2016) (same).[9]

However, motions to compel arbitration under the LMRA are subject to a six-month statute of limitations. *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 580 (2d Cir. 2019) ("We have held that the six-month statute of limitations . . . applies to actions to compel a labor

---

[9] Undoubtedly the question of "whether the parties clearly and unmistakably agreed to arbitrate," applies only after the Court determines "that an agreement [to arbitrate] exists" between the parties. *See Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 223 (2d Cir. 2019); *Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005) ("If the contract embodying a purported arbitration agreement never existed, the arbitration agreement itself does not exist."). However, like any other legal question, a concession may decisively resolve it, and "a party concedes through silence arguments made by its opponent that it fails to address." *Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 86 (E.D.N.Y. 2019) (citation omitted); *Maxum Indem. Co. v. Oxford Interior Corp.*, 443 F. Supp. 3d 348, 351 n.2 (E.D.N.Y. 2020) ("Because a party concedes through silence arguments made by its opponent that it fails to address, I assume that the [undisputed legal contention is correct]." (cleaned up)); *P.C.R. v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778 (KMK), 2022 WL 337072, at *22 (S.D.N.Y. Feb. 4, 2022) (same); *Felske v. Hirschmann*, No. 10-CV-8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) (same) (citing authorities)). Courts routinely apply principles of waiver when deciding motions to compel. *See Scott v. JPMorgan Chase & Co.*, No. 13-CV-646 (KPF), 2014 WL 338753, at *10 (S.D.N.Y. Jan. 30, 2014) (deciding the existence of agreement to arbitrate and the scope of the obligations thereof in defendant's favor, based on the fact that "[f]or strategic or other reasons unknown to the [c]ourt, [p]laintiff has failed to respond" to arguments about these points in defendant's brief), *aff'd*, 603 F. App'x 33 (2d Cir. 2015); *Costa v. Roman Health Ventures, Inc.*, No. 21-CV-5180 (PMH), 2021 WL 4991718, at *3 (S.D.N.Y. Oct. 27, 2021) (similar); *McCoy v. Dave & Buster's, Inc.*, No. 15-CV-0465 (JFB) (AYS), 2018 WL 550637, at *4 n.5 (E.D.N.Y. Jan. 24, 2018) (similar). Here, notwithstanding the Court's explicit instruction to the parties to brief the issue of whether the 2017 or 2018 CBA applies—and Defendant's extensive discussion of the matter—Plaintiff's brief is wholly devoid of any argument as to the contract's scope and applicability. The Court discerns from Plaintiff's silence, especially when considered against the backdrop of his prior vigorous defense of the argument, that he now concedes that an agreement to arbitrate, as set forth in the 2018 CBA, exists and that his claims fall within its scope. *See Scott*, 2014 WL 338753, at *10 (noting plaintiff's failure, "[f]or strategic or other reasons unknown to the [c]ourt," to respond to defendant's arguments about existence of arbitration agreement); *HDI Glob. SE v. Lexington Ins. Co.*, 232 F. Supp. 3d 595, 601–02 (S.D.N.Y. 2017) (deciding a motion to compel based on the "undisputed" point "that [the parties] signed the [contract] and that the [contract] contains an arbitration clause.").

arbitration under the LMRA." (cleaned up)).  The short statute of limitations is designed to encourage a "prompt resolution of grievances."  *See Associated Brick Mason Contractors of Greater New York, Inc. v. Harrington*, 820 F.2d 31, 37 (2d Cir. 1987); *accord Commc'ns Workers of Am., AFL-CIO v. W. Elec. Co.*, 860 F.2d 1137, 1143 (1st Cir. 1988) ("Arbitration, not litigation, is the preferred method of dispute resolution in the labor-management field[,] [and] [a]pplying a shorter statute of limitations . . . will, in our opinion, encourage [parties] to arbitrate their differences quickly.").  "It is well established that a cause of action to compel arbitration accrues when a party unequivocally refuses a demand to arbitrate."  *Harrington*, 820 F.2d at 38.  While "[e]quivocality turns on the factual circumstances in each case," at a minimum "a flat refusal to arbitrate without further inquiry or discussion of the dispute is sufficiently unequivocal."  *Atlas Air*, 943 F.3d at 581.

### 2.  Application

Defendant Garda's LMRA claim is barred by the six-month statute of limitations.  Garda served the motion in which it invoked the LMRA, for the first time, on June 24, 2022.[10]  Eight months earlier, on October 1, 2021, Plaintiff communicated an unequivocal refusal to arbitrate this matter when opposing Garda's pre-motion conference request to file this motion.  (Dkts. 12, 13, 31.)

As an initial matter, Garda nowhere responds to Plaintiff's argument that the statute of limitations ran before Garda moved to compel arbitration—which, standing alone, justifies denying Garda's motion.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the

---

[10] As discussed *supra* and *infra*, Garda did not reference the LMRA in either of its pre-motion conference letters as a basis for its motion to compel arbitration, citing instead only the FAA.  (Dkts. 12, 31.)

case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").[11]

In any event, Plaintiff's defense to the motion succeeds on its merits.  The Court agrees that Plaintiff's October 1, 2021 PMC-response letter ("October 1 Letter") was an unambiguous refusal to arbitrate.  (Dkt. 13.)  Multiple courts held that actions in litigation may be tantamount to unequivocal refusal.  *See Evans & Sutherland Computer Corp. v. Thomson Training & Simulation Ltd*., No. 94-CV-6795 (JFK), 1994 WL 593808, at *4 (S.D.N.Y. Oct. 28, 1994) (finding that the initiation of action in the English High Court seeking to enjoin the arbitration demonstrated refusal to arbitrate); *Schweizer Aircraft Corp. v. Local 1752, UAW*, 29 F.3d 83, 87 (2d Cir. 1994) (finding that a petition to stay was an "unequivocal refusal to arbitrate"); *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. King*, 812 F. Supp. 1217, 1218 (M.D. Fla. 1993) (finding that a motion contesting venue did not evince refusal to arbitrate), *aff'd sub nom. Merrill Lynch, Pierce v. King*, 3 F.3d 443 (11th Cir. 1993).  While none of these cases dealt with a pre-motion letter, they stand for the principle that a firm rejection of the duty to arbitrate, which leaves no room for further discussion, amounts to unequivocal refusal.  Read as a whole, Plaintiff's October 1 Letter communicated an unequivocal rejection of any duty to arbitrate.  (Dkt. 13 at 1 ("Garda furnishes two [agreements] and claims that Collazos is required to arbitrate his statutory claims under the [CBAs].  He is

---

[11] To the extent Defendant addresses the issue, it does so by arguing that Plaintiff's authority for his defense is inapposite under *Raymond v. Mid-Bronx Haulage Corp*., No. 15-CV-5803, 2017 WL 9882601 (S.D.N.Y. June 10, 2017).  (*See* Dkt. 41-1, at 21.)  In *Raymond*, the district court held that the six-month statute of limitations under the LMRA did not apply to a motion to compel arbitration.  However, that holding is neither surprising nor relevant because the *Raymond* court noted that the matter before it did not involve the LMRA.  *See Raymond*, 2017 WL 9882601, at *3 ("[N]either the complaint nor [d]efendants' motion to compel arbitration alleges a claim under the . . . LMRA.").  Unlike the *Raymond* plaintiff, who attempted to assert an inapplicable statute of limitations defense, Garda brings its motion under the LMRA, thus making the LMRA's short limitations period applicable and relevant.

not.").)  Notably, in his October 1 Letter, Plaintiff nowhere argues in the alternative or suggests any openness or willingness to negotiate.  (*Id.*)  It is of course true that, as the Circuit noted in the related context of arbitration under the Railway Labor Act, a party's subsequent conduct may illuminate its statements and show that they were a tentative litigation position.  *See Atlas Air, Inc.*, 943 F.3d at 581 (stating that "[w]e agree that in some circumstances a party's initial refusal to arbitrate can be rendered equivocal by the parties' subsequent statements and actions," and giving the examples of negotiations or attempts to reconcile).  Here, however, the record is devoid of any indication that Plaintiff has wavered in his anti-arbitration position during this entire case, or that any negotiations have taken place between the parties.  Garda also has not offered any evidence to the contrary.  Thus, the Court accepts Plaintiff's October 1 Letter as an unequivocal refusal to arbitrate.

Following Plaintiff's unequivocal refusal, Garda failed to timely move to compel arbitration under the LMRA.  As discussed, in its September 2021 PMC letter regarding the motion, Garda only referenced the FAA and made no mention of moving for arbitration under the LMRA.  (Dkt. 12.)  Again, at the November 2021 PMC that the Court held—after Plaintiff had filed his October 1 Letter, stating his opposition to arbitration—Garda failed to mention or invoke the LMRA.  (11/10/2021 Minute Entry; Transcript of 11/10/2021 PMC, Dkt. 16.)  In February 2022, to determine whether the UFSPSO and SSOBA were necessary parties, Plaintiff and the Defendant jointly moved to stay the briefing schedule.  (Dkt. 17.)  The Court granted the motion to stay on February 15, 2022.  (02/15/2022 Docket Entry.)   The Court lifted the stay of briefing on May 3, 2022.  (05/03/2022 Docket Entry.)  Garda served Plaintiff with its motion to compel arbitration on Plaintiff on May 18, 2022, again without mentioning the LMRA and relying exclusively on the FAA.  (Dkt. 28; *see also* Dkt. 41-1.)  The day before Plaintiff's opposition was

due, Garda asked to file a "revised" motion, with Plaintiff's consent, based on Garda's desire to brief an intervening Supreme Court case, interpreting the FAA. (Dkt. 30.) The Court granted that brief extension. (06/21/2022 Docket Entry.) Then, on June 24, 2022, Garda served Plaintiff with the current iteration of its motion to compel, introducing its LMRA claim for the first time. (Dkt. 31; *see also* Dkt 41-1 (comparing the May 18 and the June 24 motions.).) The Court notes that under appropriate circumstances a "stay tolls the statute of limitations." *Javier H. v. Garcia-Botello*, 239 F.R.D. 342, 348 (W.D.N.Y. 2006); *see also Cole v. Miraflor*, No. 99-CV-0977 (RWS), 2001 WL 138765, at *6 (S.D.N.Y. Feb. 19, 2001) ("The limitations period was equitably tolled during the stay of discovery"). Nonetheless, even discounting the duration of the stay in this matter, Garda raised its LMRA claim too late.[12] Thus, the Court finds that Garda's LMRA claim is untimely and dismisses it.

## B. The FAA

### 1. Legal Standard

In response to many years of judicial antagonism to arbitration, Congress enacted the FAA, thereby mandating that all arbitration contracts "shall be . . . valid, irrevocable, and enforceable." *See* 9 U.S.C. § 2; *see also Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022) (same). The FAA "reflects both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Kai Peng v. Uber Techs., Inc*., 237 F. Supp. 3d 36, 45 (E.D.N.Y. 2017); *HDI Glob.*, 232 F. Supp. 3d at 601 ("[T]he FAA is an expression of a

---

[12] 137 days passed between Plaintiff's unequivocal refusal to arbitrate on October 1, 2021 and the parties' joint request to stay motion briefing on February 15, 2022. The Court lifted the stay on May 3, 2022, and Garda first raised its LMRA claim on June 24, 2022, 51 days later. Thus, excluding the time the Court stayed briefing in this matter, 188 days—several days over the six-month limitations period—passed from the moment Garda received Plaintiff's rejection until it moved to compel arbitration pursuant to the LMRA.

strong federal policy favoring arbitration as an alternative means of dispute resolution." (cleaned up)). Indeed, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) ("This policy is founded upon a desire to preserve parties' ability to agree to arbitrate, rather than litigate, their disputes." (cleaned up)). A standard akin to a Rule 56 motion for summary judgment governs motions to compel arbitration. *See Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833 (2d Cir. 2021) (citation and quotations omitted); *Castellanos v. Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 297 (E.D.N.Y. 2018) (same). In resolving motions to compel arbitrations, the following elements are to be considered: "(1) whether the parties agreed to arbitrate; (2) the 'scope' of the arbitration agreement; (3) whether the plaintiff's federal statutory claims are 'nonarbitrable'; and (4) if some, but not all of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration." *Abdullayefva*, 928 F.3d at 222 (citation omitted); *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 408–09 (S.D.N.Y. 2016) (same); *Lai Chan v. Chinese-Am. Plan. Council Home Attendant Program, Inc.*, 180 F. Supp. 3d 236, 239–40 (S.D.N.Y. 2016) (same).

However, Section 1 provides that nothing within the FAA shall apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (citing 9 U.S.C. § 1) (cleaned up); *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019) (explaining that "[b]y the time it adopted the [FAA], Congress had already prescribed alternative employment dispute resolution regimes for many transportation workers [and seemingly] . . . did not wish to unsettle those arrangements in favor of [arbitration]."). The Section 1 exclusion applies to an "employee

[who] is part of a class of workers: (1) employed in the transportation industry; and (2) who, in the main, actually engage in foreign or interstate commerce." *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 661 (2d Cir. 2022) (noting the test the Eleventh Circuit articulated in *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1340 (11th Cir. 2021)).[13] Further, because "not everyone who works in a transportation industry is a transportation worker," *id*. at 661, an exempt employee must also belong to a class whose "actual" and "frequent[]" work for the employer involves transportation. *Id.* ("[N]ot everybody who works in the airline industry [or in the transportation industry] is a transportation worker—many airline employees are engaged in accounting, regulatory compliance, advertising, and such." (citations and quotations omitted)).

### 2. Application

#### a. Plaintiff is Not Exempt Under the FAA

The Court first addresses Section 1 exemption. *See New Prime*, 139 S. Ct. at 537–38 ("Given the [FAA's] terms and sequencing, it is now well-established that a court should decide for itself whether § 1's 'contracts of employment exclusion' applies before ordering arbitration." (cleaned up)). While Plaintiff and his class are transportation workers, because they are not engaged in foreign or interstate commerce within the meaning of Section 1, the Court finds that they are not exempt under the FAA and must arbitrate their claims.

---

[13] Circuits are divided on whether a plaintiff must demonstrate membership in the "transportation industry" to qualify as an exempted worker under Section 1. *Compare Lopez v. Cintas Corp.*, 47 F.4th 428, 431 (5th Cir. 2022) (holding that delivery drivers for a clothing company were not exempt under Section 1, and articulating the test as membership in a "class of workers" whose work "actually" involved transport and which was "engaged in foreign or interstate commerce.") *and Immediato v. Postmates, Inc*., 54 F.4th 67, 74 (1st Cir. 2022) (similar) *with Bissonnette* 49 F.4th at 661 (holding that drivers who delivered baked goods were not covered by Section 1 because they were not part of the 'transportation industry') *and Hamrick*, 1 F.4th at 1340 (similar) *and Lenz v. Yellow Transp., Inc*., 431 F.3d 348, 350 (8th Cir. 2005) (similar).

**(1)     Transportation Industry**

Plaintiff and the putative class form part of the transportation industry.  "An individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement." *Bissonnette*, 49 F.4th at 661.[14]  In *Bissonnette*, the Circuit held that truck drivers delivering baked goods were not part of the transportation industry, but were instead part of the baking industry.  *Id*. at 661–62.  The Circuit reasoned that "customers pay for the baked goods themselves," and the fact that the pastries had to be transported and delivered was incidental to the chief trade of selling of "breads, buns, rolls, and snack cakes."  *Id*.  Here, by contrast, Garda's transportation and delivery of currency and commodities *is* its business; the sole source of its revenue is from the movement of valuable goods in its vehicles.  (*See* Dkt. 1-1, ¶¶ 2, 20–21.)  Although the security features of Garda's vehicles and services are an important aspect of its enterprise, they do not alter the fundamental character of Garda's business as a transportation service.  Nor do they turn Garda's business into one that primarily provides security services or its drivers into security guards on wheels, *i.e.*, part of the security industry.[15]  *See, e.g.*, *Richardson v. Dermira, Inc.*, No. 21-CV-15 (JAM), 2022 WL

---

[14] The parties have not briefed the question of what impact the Circuit's decision in *Bissonnette*, issued two months after the closing of their briefs, may have had on this issue. However, for the sake of judicial efficiency and consistent with its obligation to apply governing precedent, the Court addresses it *sua sponte*.

[15] The view that the Garda drivers were part of the security industry is arguably buttressed by various references in the agreement to the drivers as "shuttle and vault drivers [or] messengers [or] guards." (Dkt. 35-2, at 2; *see also id.* at 21 (referring to employees as "full-time and part-time messenger/guard employees.").  Similarly, the 2018 CBA also put "crew leaders" on notice that they might be required to have "guard and gun permits or licenses on a current basis."  (*Id.* at 22; *see also id.* (requiring gun licenses for "crew chief" positions.)).  Finally, the 2018 CBA noted that "disqualification from carrying … a valid gun permit or license" was sufficient cause to discharge a Garda driver.  (*Id.* at 5.)

527779, at *2 (D. Conn. Jan. 31, 2022) (finding that the exemption did not apply to a traveling pharmaceutical salesperson because her "company itself [was] not part of the transportation industry").  Garda customers pay for the transportation of valuable goods, albeit in a secure manner, with the transportation itself being the primary service charged and paid for.  Holding the opposite would turn *Bissonnette* on its head, allowing the more incidental features of a service to subsume its core character.  Similarly, an airline might include entertainment or dining options on their flights that make the trip more attractive to customers, but these amenities do not alter the essential character of the airline business as providing transportation services, nor do they transform the business into one in the hospitality or entertainment industry.  *See Bissonnette*, 49 F.4th at 661 ("An airline, an analog to transport by rail and sea, is in the business of moving people and freight, and its charges are for activity related to that movement [because] [c]ustomers do not fly for the entertainment or the food.").  Here too, Garda's provision of security features is an incidental feature of the voyage, albeit an important one, that merely makes the service more attractive to customers and ensures that "[the goods] arrive."  *Bissonnette*, 49 F.4th at 661; *cf. Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1289 (11th Cir. 2005) (holding that an accountant working in a company selling and delivering furniture was not part of the "transportation industry.").[16]

**(2)   Engaged in Foreign or Interstate Commerce**

Plaintiff and the putative class are not engaged in interstate commerce within the meaning of the FAA.  Section 1 exempts contracts involving "workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  The Supreme Court concluded that Section 1 should not be "read as expressing congressional intent to regulate to the outer limits of authority under the Commerce

---

[16] It is undisputed, and the Court accepts as correct, that Plaintiff and the putative class actually work as drivers involved in the transportation of valuable goods for Garda.

Clause." *Circuit City*, 532 U.S. at 115–16.   Specifically, while the "word[s] 'involving [commerce],' . . . signal an intent to exercise [the] commerce power to the full," Congress used the specific phrase "'engaged in [. . .] commerce' [in Section 1,] [which is] understood to have a more limited reach." *Id.*  Thus, unlike Section 2, which exercises Congress's Commerce Clause power in full, Section 1 merely applies to "any class of workers *directly* involved in transporting goods across state or international[.]" *See Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022) (emphasis added); *id.* at 1790 ("[A] worker must at least play a direct and necessary role in the free flow of goods across borders." (cleaned up)).[17]

To start, the Court does not find relevant to this case another district court's ruling that employees in Garda's sister company are involved in interstate commerce (under a different statute).  In *Rojas v. Garda Se., Inc*., the Southern District of Florida concluded that drivers in one of Garda's sister companies were employed in "interstate state commerce" based on "annual paperwork to the [Federal Motor Carrier Safety Administration]" and the fact that the sister company was obligated to file annual reports to the "Department of Transport."  *See* 2015 WL 5084135, at *3 (S.D. Fla. Aug. 28, 2015).  Because it involves a wholly different entity and a different statute, *Rojas* is inapposite.  First, the *Rojas* court was not required to consider the more circumscribed definition of interstate commerce for purposes of Section 1 of the FAA, as the Supreme Court explained in *Circuit City*.  Second, because Plaintiff did not produce any evidence, the record before the Court is devoid of any of the materials that the *Rojas* court considered.

Furthermore, the Court disagrees with Plaintiff's argument that Garda drivers are "engaged in interstate commerce" under Section 1 of the FAA simply because they transport currency that

---

[17] As Plaintiff does not respond to or contest Garda's representation that most of its drivers' trips are segmented intrastate operations, the Court accepts that fact for purposes of this motion.

originated from out-of-state and circulates in interstate commerce. *Saxon* is instructive. There, the Supreme Court considered whether Section 1 of the FAA covered employees who had loaded and unloaded cargo into airplanes flying across state lines. As here, the employees loading and unloading goods remained within state borders; only the goods themselves crossed state lines. *See Saxon*, 142 S. Ct. at 1789. The Court found that the cargo employees were engaged in interstate commerce and thus exempt under Section 1. It noted that the cargo employees were "physically loading cargo directly on and off an airplane headed out of State." *Id.* at 1792. In reaching that conclusion, the Court distinguished cases where employees merely supplied "localized [] services to a corporation engaged in interstate commerce." *Id.* Thus, *Saxon* teaches that the pivotal inquiry under Section 1 is whether the employees are "far more removed from interstate commerce," or instead perform "activities within [its] flow." *Id*.

This interpretation of *Saxon* is consistent with decisions both following and preceding it, which seem to hinge on the existence of an on-going and closely integrated operation to transport goods out of state. *See Lopez v. Cintas Corp.*, 47 F.4th at 430 (holding that truck drivers that picked up goods arriving from out of state—after the goods had already crossed state-lines and were unloaded—for deliveries intrastate were not exempt under Section 1); *Wallace v. GrubHub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) (holding that food deliverers are not exempt, despite delivering "goods that have moved across state and even national lines," where the workers were not part of a larger scheme, operated solely in Illinois, and rarely moved in channels of interstate commerce); *Davarci v. Uber Techs., Inc.*, No. 20-CV-9224 (VEC), 2021 WL 3721374, at *13 (S.D.N.Y. Aug. 20, 2021) (finding that Uber drivers were not exempt under Section 1 because, unlike Amazon couriers who "continue the last leg of an unbroken, interstate journey," an Uber driver does not engage in a "continuous chain of cross-border transportation controlled or

even coordinated by Uber.").  This case law suggests that when goods or persons originate from out-of-state, the test for whether interstate commerce has ended—and purely intrastate commerce has begun—is whether the goods have reached their final destination in terms of the state to which they are being transported.  *See Lopez*, 47 F.4th at 430 (finding truck drivers not exempt when they picked up goods from a company that had ordered out-of-state goods for delivery by the drivers within the state); *Wallace*, 970 F.3d at 802 (finding food deliverers operating intrastate not exempt when they picked up goods that local restaurants had ordered from out-of-state).  To decide whether goods or persons have reached their final destination, the case law adopts the perspective of the person who ordered the goods or the person who decided to travel out of state.  *See Waithaka v. Amazon.com, Inc*., 966 F.3d 10, 26 (1st Cir. 2020) (finding that couriers of goods were exempt because they were still in the process of delivering goods to individuals that had ordered them from out of state); *Rittmann v. Amazon.com, Inc*., 971 F.3d 904, 915 (9th Cir. 2020) (finding that Amazon couriers were exempt because they completed "the last leg of the shipment" to individuals that ordered out-of-state goods); *cf. United States v. Yellow Cab Co*., 332 U.S.  218, 228–29 (1947) (finding, in the antitrust context, that Illinois cab drivers who transported shuttle passengers headed out-of-state to train stations in Chicago operated in interstate commerce as "the fact that a part of [an interstate] journey [was] within the boundaries of one state does not make that portion of the trip any less interstate in character.").  Thus, when goods or persons that originated outside of a state are handled and/or transported thereafter purely intrastate, the workers involved in the intrastate activity are not deemed to be "engaged in interstate commerce" and are therefore not exempt under Section 1.

Applying these principles here, the Court finds that Plaintiff and the putative class, all of whom are or were employed by Garda as drivers, are not engaged in foreign or interstate commerce

under Section 1 of the FAA.  First, Garda drivers are "far removed from interstate commerce," and form no part of an integrated scheme to transport goods across state lines.  They perform segmented trips in the State of New York to deliver currency; they are not part of a continuous operation to move goods or persons across state-lines.  *See Davarci*, 2021 WL 3721374, at *9 ("[T]he Court focuses its analysis on the overall class of workers to which Plaintiffs belong." (collecting cases)).  Even though the currency that Garda drivers transport originates outside New York, the Garda drivers enter the picture only after the interstate portion of the journey has ended and the currency has reached the state of its final destination, *i.e.*, New York.[18]  Whether the currency will ever be used in interstate commerce (or originated out of state) is irrelevant.  As the Supreme Court made clear in *Saxon*, the fact that a good is "perceptibly connected to [the] instrumentalities of interstate commerce was not enough."  *Saxon,* 142 S. Ct. at 1792 (reaffirming a case where the employees of "a firm making intrastate sales of asphalt w[ere] not engaged in [interstate] commerce. . .  [even though] the asphalt was later used to make interstate highways.");  *see also Wallace*, 970 F.3d at 802 (rejecting the argument that "the residual exemption is not so much about what the worker does as about where the goods have been," and similarly rejecting an interpretation of Section 1 as applying to "dry cleaners [delivering] pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from [] out-of-state dairy").  Thus, the Court finds that Garda drivers are not exempt under Section 1 and therefore come within the scope of the FAA.

---

[18] In this respect, the "goods" that Garda handles and delivers, *i.e.*, currency, differs from the goods at issue in above-discussed decisions.  Because U.S. currency is not minted in New York, it necessarily has to have been transported interstate before coming into the possession of the Garda customer.  However, that customer did not specifically order the interstate transportation of the currency into New York.  So, applying the test of whether the currency has reached its final destination, or is still enroute to another out-of-state destination, is a bit of a fiction.

###### b. **Plaintiff Has Waived His Right to a Judicial Forum**

Finally, Plaintiff argues that he has not waived his rights to a judicial forum, but the Court disagrees.  It is true that "[a] collective bargaining agreement cannot preclude a lawsuit concerning individual statutory rights unless the arbitration clause in the agreement was 'clear and unmistakable' that the parties intended to arbitrate such individual claims." *Alderman*, 733 F. Supp. 2d at 469.  It is also accurate that "[c]ourts in this Circuit have since applied [that principle] to claims arising under [under New York employment law]." *Alfonso v. Maggies Paratransit Corp.*, 203 F. Supp. 3d 244, 248 (E.D.N.Y. 2016).  "The clear and unmistakable standard [] require[s] specific references in the CBA either to the statutes in question *or to statutory causes of action generally*." *Lawrence v. Sol G. Atlas Realty Co*., 841 F.3d 81, 84 (2d Cir. 2016) (emphasis added).  Thus, an operative contract need not specifically identify the statutes at issue to waive the right to a judicial forum. *See Sanchez*, --- F. Supp. at ----, ----, 2022 WL 16578981 at *6 (collecting cases).

In this matter, the 2018 CBA provides that the duty to arbitrate applies to any "grievance," which "is defined as a condition that exists as a result of an unsatisfactory response or adjustment or failure to adjust a legitimate controversy, claim or dispute by an employee, shop steward or the Union concerning rates of pay, entitlement to compensation, benefits, hours, or working conditions set forth herein, including without limitation, . . . any claim under any *federal, state or local law*, statute or regulation or under any common law theory whether residing in contract, tort or equity or any other claim related to or part of the employment relationship."  (Dkt. 35-2, at 8 (emphasis

added).)  Thus, the arbitration provision in the 2018 CBA encompasses Plaintiff's statutory claims, and compels arbitration of those claims.[19]

### c.  Staying The Proceedings

Having decided that Plaintiff's claims must be arbitrated, the Court now considered whether to dismiss or stay this action.  The FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay [is] requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015).  Defendant has requested a stay, and the Court is now referring all of Plaintiff's claims to the Arbitrator.  Thus, the Court stays this matter.[20]

---

[19] Plaintiff's remaining arguments are meritless and warrant only a short discussion.  First, the mere fact that the ultimate decision whether to pursue arbitration rests at the SSOBA's discretion does not mean that the arbitration procedure itself is permissive. *See Chefs' Warehouse, Inc. v. Wiley*, No. 18-CV-11263 (JPO), 2019 WL 4640208, at *5 (S.D.N.Y. Sept. 24, 2019) (holding that "argument that the word 'may' [as to the ultimate decision by the union to arbitrate] renders the Arbitration Procedure optional and permissive has been rejected by courts." (citing *Local 771, I.A.T.S.E. v. RKO General, Inc., WOR Division*, 546 F.2d 1107, 1116 (2d Cir. 1977)); *Lopez v. Time, Inc.*, No. 93-CV-5330 (RPP), 1994 WL 88062, at *5 (S.D.N.Y. Mar. 14, 1994) (similar)).  Second, the fact that the two unions that represented Garda drivers during Plaintiff's employment disclaim any duty to arbitrate—before receiving the concrete decision of the Court as to their obligations or demand from Plaintiff to arbitrate—does not mean that arbitration is not required under the applicable CBA.  Third, to the extent Plaintiff would be able to present a colorable claim that the SSOBA categorically refuses to vindicate his rights through arbitration, the Court will entertain Plaintiff's motion and permissive to be excused from arbitration. *See Alfonso*, 203 F. Supp. 3d at 250 ("Courts in this Circuit . . . have found collective bargaining agreements unenforceable only where the submission of a statutory claim to arbitration is exclusively within the province of the union and the union has, *in fact*, declined to pursue the matter." (emphasis in original)).

[20] Because the FAA provides an adequate basis to compel arbitration, the Court need not consider Defendant's claim pursuant to Article 75 of the New York Civil Practice Law and Rules.

**CONCLUSION**

For the reasons stated herein, Defendant's motion to compel arbitration is granted and

this matter is stayed pending arbitration.  All pending motions are denied as moot.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 31, 2023
        Brooklyn, New York

23